Filed 1/28/21  P. v. Canchola CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047703 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. Nos. SS141485A, SS102792A) |
| v. | |
| ARMANDO GARZA CANCHOLA, | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

In case No. SS141485A, defendant Armando Garza Canchola was convicted by jury of two counts of assault (Pen. Code, § 240),[1] one count of assault on a peace officer (§ 245, subd. (c)), and one count of active participation in a criminal street gang (§ 186.22, subd. (a)).  The jury found true allegations that defendant personally inflicted great bodily injury (§ 122022.7, subd. (a)) and allegations that he committed the assault on a peace officer to benefit a criminal street gang (§ 186.22, subd. (b)(1)).  The trial court found true an allegation that defendant had a prior serious felony conviction (§ 667, subd. (a)(1)) and an allegation that defendant had two prior "strike" convictions (§ 1170.12, subd. (c)(2)).  At a combined sentencing hearing, the trial court sentenced

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defendant to a prison term of 40 years to life, consecutive to a 42-year sentence for an earlier voluntary manslaughter case (No. SS102792A).

In a prior appeal by defendant regarding case No. SS141485A (assault on a peace officer), this court reversed the judgment and remanded the matter for resentencing for the trial court could determine: (1) whether to exercise its discretion pursuant to section 1385 to dismiss the gang enhancement (§ 186.22, subd. (b)(1)); and (2) whether to exercise its discretion pursuant to section 1385 to strike defendant's prior serious felony conviction for the purposes of sentencing him under section 667, subdivision (a). (*People v. Canchola* (Jan. 31, 2019, H044154) [nonpub. opn.], pp. 21-22.)

At the subsequent resentencing hearing, the trial court denied defendant's request to strike the additional punishment for the gang enhancement but stayed the punishment for the serious felony enhancement. Defendant was sentenced to 35 years to life in case No. SS141485A (assault on a peace officer), consecutive to a 42-year sentence in the earlier voluntary manslaughter case, No. SS102792A.

In the pending appeal, defendant contends that the trial court abused its discretion in denying his request to strike the additional punishment for the gang enhancement in case No. SS141485A (assault on a peace officer). He also argues that he is entitled to an additional 1,092 days of credit for his actual time in custody between resentencing hearings in case No. SS102792A (voluntary manslaughter). Lastly, defendant contends that errors regarding the abstract of judgment require correction.

For reasons that we will explain, we will modify the judgment to reflect that defendant is entitled to an additional 1,092 days of credit in case No. SS102792A, order the preparation of amended abstracts of judgment, and affirm the judgment as modified.

## II. BACKGROUND

Defendant's convictions in case No. SS141485A arose from a group assault on Monterey County Sheriff's Deputy Nicholas Menezes, by inmates in a Norteño pod at the

Monterey County Jail. At trial, the prosecution's theory was that the assault was directed by the pod's "shot-caller," inmate Alberto Cortez. The defense argued that the evidence did not show an assault ordered by the gang and that there was no evidence defendant ever "touched" Deputy Menezes during the incident.

### A.    *The Jail Assault*

On May 25, 2014, Monterey County Sheriff's Deputy Michelle Bossuot was observing Deputies Max Crowell, Bryan Whaley, and Menezes as they pat searched inmates from the J pod in preparation for allowing those inmates to go out to the yard. The inmates were lined up along a wall in a hall outside the J pod, a designated Norteño pod.

Inmate Giovanni Pacheco would not spread his legs when directed to do so by Deputy Menezes. As Deputy Menezes tried to search Pacheco, Pacheco elbowed him in the chest. Deputy Menezes therefore put Pacheco into a "wrist lock" and escorted Pacheco back into the pod, with Deputy Crowell following. Deputy Menezes placed Pacheco in handcuffs and escorted Pacheco back out of the pod. Some of the inmates began "talking shit," and Pacheco began kicking Deputy Menezes in the legs. Deputy Menezes ordered Pacheco to drop to his knees, but Pacheco did not do so. Deputy Menezes then did a "leg sweep" to get Pacheco to his knees.

Cortez yelled, "Get him. Get him. Get him." In response, at least five inmates—including defendant—ran over and began attacking Deputy Menezes, who was kneeling on the ground next to Pacheco. Deputy Menezes was kicked in the face, causing his head to snap backwards. He felt punches "raining" down on his head and neck. He fought his way up to a standing position and covered his head with one arm, using the other arm to try to "fend off as many people" as he could. He could see defendant in the group that was attacking him. At one point, defendant was trying to pull Deputy Menezes down.

Deputy Menezes was able to access his baton and began using it to strike the inmates who were attacking him. Meanwhile, Deputy Bossuot called for backup, pulled

3

out her Taser, and aimed the Taser at defendant, who was throwing punches towards Deputy Menezes. Deputy Crowell used his baton to strike other inmates involved in the assault. He hit two inmates on the back and hit one inmate on the head. Another inmate was tased by Deputy Whaley.

After the deputies got the inmates under control, Marcos Zamora, one of the other inmates who had been involved in the assault told Cortez (the "shot-caller"), "Look what they did to my head." Cortez responded, "Don't worry, we'll get them back."

After the assault, Deputy Menezes was "covered in blood" and appeared to be disoriented. He was taken to the hospital, where he received stitches for a cut above his eye. He was diagnosed with a traumatic brain injury. For about a year after the assault, he had trouble walking, especially going up and down stairs. Deputy Menezes was still receiving follow-up medical treatment at the time of trial, for post-concussion syndrome and a pinched nerve in his neck. Deputy Menezes had no feeling in parts of his arm. He also had cognitive deficits, headaches, nausea, and dizziness. He had not worked since the incident.

## B. *Gang Expert Testimony*

Monterey County Sheriff's Deputy Jesse Pinon testified as the prosecution's gang expert. He described how the "Norteno-Sureno thing" started in California prisons with the Nuestra Familia organizing to combat the bullying that northern Hispanic inmates were experiencing from Mexican Mafia inmates. He described how both the Mexican Mafia and the Nuestra Familia are "very sophisticated," with a hierarchy from the prison to the streets. On the streets, Norteños are the Nuestra Familia's "foot soldiers."

In the Monterey County Jail, the Nuestra Familia has a "shot-caller or leader" and a chain of command. If a Norteño inmate attacks a jail deputy, it shows the gang member's power and "that they're willing to do whatever for the gang."

During Deputy Pinon's testimony, the parties informed the jury of a stipulation: "that the defendant has been convicted of voluntary manslaughter, with an enhancement

4

that it was done for the benefit of the gang." The jury was informed that the conviction arose from an "event that happened in 2010." According to Deputy Pinon, the fact that defendant had admitted having committed a homicide for the benefit of the gang was significant to him, because it showed defendant's "willingness to do things for the gang" even if there was a risk to his future. Defendant was willing to spend the rest of his life in prison for the gang.

Deputy Pinon had researched defendant's prior contacts with law enforcement, finding indicia of gang association such as defendant's clothing, tattoos, statements, and companions. One tattoo read, "Soulless against all odds." It meant defendant had "no heart" and was "willing to do whatever he can for the gang" without a second thought. Defendant's jail and prison records showed he was an active Norteño gang member. Defendant had not been assaulted while he was housed in J pod, showing that "he was in good standing" with the gang.

Deputy Pinon had also researched the backgrounds of the other inmates in J pod, the majority of whom had Norteño gang affiliation. He described how Norteños follow the "Fourteen bonds," which are essentially bylaws. The "bonds" include "backing up" a fellow gang member and "not being a coward."

Deputy Pinon was familiar with Cortez, who had previously been convicted of murder for the benefit of a gang. Cortez had a tattoo reading "scrap killer." The word "scrap" referred to Sureños. Cortez also had other gang-related tattoos. Deputy Pinon believed Cortez was a shot-caller in the Monterey County jail.

Deputy Pinon described the "shot-caller" in a jail's gang pod as the person who makes all the decisions for the pod. If a shot-caller in a Norteño jail pod told other Norteños in the pod, "Get him, get him, get him," referring to a deputy, that would be perceived as "an order from the gang to the soldiers of the gang." The gang members would be required to attack the deputy; if they did not, they would be subject to discipline from the gang for an "act of cowardice." The discipline could include being assaulted or

5

killed. A group assault on a deputy would strengthen the power of the gang by showing that the gang is "not scared of the law."

Deputy Pinon described the primary activities of "Nortenos in the Norteno pods in the Monterey County Jail" as including the commission of murder, manslaughter, assault with a deadly weapon, robbery, extortion, carjacking, and other crimes. He agreed a pattern of criminal gang activity was shown by the murder Cortez committed for the benefit of the gang, the manslaughter defendant committed for the benefit of the gang, and the assault on Deputy Menezes by members of the gang.

### C. *Defense Case*

The emergency room doctor who treated Deputy Menezes had diagnosed him with a "closed head injury." Deputy Menezes had complained of having been punched in the face. X-rays of his neck did not show any abnormalities. However, a bulging disc or pinched nerve would not have appeared on an x-ray.

Monterey County Sheriff's Deputy David Vargas interviewed Deputy Menezes by phone the day after the assault. Deputy Menezes said he was taking pain medication, and he was having difficulty communicating. Deputy Vargas therefore set up a meeting about a week later, on June 3, 2014. At that time, Deputy Menezes had a scar from his laceration, but he had no other bruising on his face.

### D. *Charges, Verdicts, and Sentence*

Defendant was charged in case No. SS141485A with battery with injury on a peace officer (§ 243, subd. (c)(2); count 1), battery with serious bodily injury (§§ 242, 243, subd. (d); count 2), assault on a peace officer (§ 245, subd. (c); count 3), and active participation in a criminal street gang (§ 186.22, subd. (a); count 4). The amended information alleged that defendant personally inflicted great bodily injury on Deputy Menezes (§§ 969f, subd. (a), 12022.7, subd. (a)), that defendant committed counts 1 through 3 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that

6

defendant had two prior voluntary manslaughter convictions that qualified as serious felonies (§ 667, subd. (a)(1)) and strikes (§ 1170.12, subd. (c)(2)).

In counts 1 and 2, a jury found defendant not guilty of the two felony battery charges but guilty of the lesser included offense of assault (§ 240) as to both counts. The jury found defendant guilty of count 3 (assault on a peace officer) and count 4 (active participation in a criminal street gang). The jury found true the allegation that defendant personally inflicted great bodily injury in the commission of counts 3 and 4, and it found true the gang allegation associated with count 3. The trial court found true one prior serious felony conviction allegation and both prior "strike" allegations.

At the sentencing hearing, the trial court denied defendant's *Romero*[2] motion to strike the prior strike allegations. The court also stated that it did not have the discretion to dismiss the gang enhancement. The court proceeded to impose a term of 40 years to life, comprised of an indeterminate term of 25 years to life for count 3 (assault on a peace officer), a determinate term of 10 years for the criminal street gang allegation associated with count 3, and a determinate term of 5 years for the prior serious felony allegation. The terms for counts 1, 2, and 4 were stayed pursuant to section 654, and the term for the great bodily injury allegation associated with count 3 was also stayed. The trial court ordered defendant's sentence in this case to run consecutive to a 42-year sentence in an earlier voluntary manslaughter case (No. SS102792A).

### E. *Defendant's First Appeal*

In defendant's first appeal, he contended that (1) the trial court erroneously believed it could not dismiss the gang enhancement or strike the punishment for that enhancement, and (2) the court had discretion to strike his prior serious felony conviction under a new law that applied retroactively to him. This court reversed the judgment and remanded the matter for resentencing for the trial court to determine: (1) whether to

---

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

7

exercise its discretion pursuant to section 1385 to dismiss the gang enhancement (§ 186.22, subd. (b)(1)); and (2) whether to exercise its discretion pursuant to section 1385 to strike defendant's prior serious felony conviction for the purposes of sentencing him under section 667, subdivision (a).

## F.  *Trial Court Proceedings After First Appeal*

### 1. Defendant's written request to strike the punishment
### for the gang enhancement

After the case was remanded to the trial court, defendant filed a written request to " 'strike the additional punishment' " of five years for the serious felony enhancement and 10 years for the gang enhancement in the interests of justice under section 1385, subdivision (b)(1).  In support of striking the punishment for the two enhancements, defendant made the following arguments.

First, defendant observed that his original sentence of 40 years to life, which was ordered to run consecutive to a 42-year sentence in case No. SS102792A, resulted in an aggregate sentence of 82 years to life.  He contended that he would not be eligible for parole consideration until he had served 70 years.  Defendant argued that if the court struck the serious felony and gang enhancements, defendant's aggregate sentence for both cases would be 67 years to life, and he could seek parole after serving 57 years when he was 79 years old.

Second, defendant provided an excerpt from his *Romero* motion, which the trial court had denied at the original sentencing.  Defendant indicated that he was adopting the statement of facts set forth in his *Romero* motion, in which he had argued that a deputy "tased" him and that he did not join in the subsequent assault on Deputy Menezes. Defendant also questioned the severity or extent of injuries suffered by Deputy Menezes as a result of the assault.

8

Third, defendant contended that his family had "continued dedication to him as a person," as reflected in letters of support that were prepared in connection with his original sentencing.

Fourth, defendant acknowledged that since his original sentencing, he had been disciplined for violating prison rules on three occasions. In July 2017, two cell phones and other items were found to be hidden in the prison. Defendant was determined to have possessed one of the phones based on pictures in the phone and the fact that his father's phone number was programmed into the phone. In December 2017, defendant was determined to have engaged in a fight with another inmate. In July 2018, defendant and another inmate were in a cell that contained approximately two gallons of inmate manufactured alcohol.

Defendant contended, however, that he had made "strides" while incarcerated. He worked as a "porter" in prison and was paid for his work. Defendant also provided documentation showing that he had completed or was participating in several programs while in prison, including regarding gang awareness, alternatives to violence, art, religion, and substance abuse.

## 2. Resentencing hearing

The resentencing hearing was held on November 14, 2019. The prosecutor contended that while defendant was awaiting sentencing in another case for two killings with a gang enhancement (case No. SS102792A), defendant "in a Norteno pod, took the orders of the shot-caller" and, along with several others, attacked Deputy Menezes "and disabled him for life, all because the gang told him to do it." The prosecutor argued that the question was whether defendant deserved an "increased penalty for acting on behalf of the Norteno criminal street gang." The prosecutor contended that the gang engaged in the attack to "instill fear in deputies so that they won't mess with the gang members, they won't search them as closely, they won't regulate their behaviors, to instill fear in other inmates that the gang is so scary they will attack a deputy and disable a deputy and so

everyone else should be afraid of them as well." The prosecutor argued against "[t]he idea that now [defendant] should get some kind of reprieve from his choices to act violently, three times at least, on behalf of the Norteno street gang now because he's taken a few classes in prison . . . ." According to the prosecutor, "[t]hese weren't youthful misunderstandings. These weren't momentary lapses of judgment. This was a lifestyle that [defendant] has not just embraced but risen to the highest level. He was an assassin for the Norteno street gang, and he ruined an officer, a deputy's life, who still doesn't work, still is disabled, and still is suffering for the defendant's choice." The prosecutor contended that "the interest of justice does not mean that [defendant] should be relieved of the penalties that the [L]egislature set down for those crimes." In addition to the gang enhancement, the prosecutor also argued that the trial court should impose the serious felony enhancement. The prosecutor concluded by stating, "[T]he People strongly oppose any reduction by a single day. He deserves everything he gets."

Defense counsel explained that defendant was requesting that the punishment, not that the enhancements themselves, be struck and that the request would not "make a massive difference" in the length of his sentence. Counsel contended that defendant had participated in a "significant amount" of prison programs, which were for rehabilitative purposes, and that defendant had "certainly lived up to that portion today" and had "made significant strides" while in custody.

Defendant also spoke during the sentencing hearing. He admitted making "some bad decisions" and stated that he did not want to "downplay" his offenses. Defendant had participated in prison programs and indicated that he was a different person now. ~(RT 9)~ He acknowledged that he was facing a "long sentence," but stated, "I remain positive, and I wake up, and I do my best." Defendant further stated that he would "continue to . . . remain positive and grow," and that he would "continue to better" himself. He indicated that he had been accepted for a college humanities class in the fall,

10

and that he took "pride in being acknowledged for something positive instead of being on the front page talking about I got convicted for something."

The trial court indicated that it has seen the document regarding the humanities class and expressed its understanding that defendant's family visited him regularly. The court then stated to defendant: "I have no doubt . . . you would not be taking these classes and doing these things if you had stayed in the lifestyle that you were in. So . . . when I tell people, . . . 'Take advantage of programs in prison,' you truly have done that. So now when I say that to people, I know that it can happen.

"I have no doubt you're a different person than you were when these crimes occurred. Yet [the prosecutor] has a good point. The horrific nature of the crime here and the gang crimes that you were committing, I still think that large number of years, obviously, is appropriate for your sentence because of the nature of these offenses.

"The gang enhancement here, this whole assault was gang driven. I mean, it was as [the prosecutor] said, a shot-caller and the [C]ourt of [A]ppeal has adopted, basically, that statement of facts as to what happened in this case to Mr. Cortez, having given the order . . . to attack, and fellow gang members did. I do think the gang enhancement here, within my discretion, I do think it's appropriate where this was solely a gang-driven offense."

The trial court proceeded to impose the same sentence, including the 10-year gang enhancement, except the court "stay[ed]" the punishment for the five-year serious felony enhancement "in the interest of justice." Defendant's total sentence was 35 years to life consecutive to a 42-year sentence in an earlier voluntary manslaughter case (No. SS102792A), resulting in an aggregate sentence of 77 years to life.

11

### III.   DISCUSSION

**A.    *Gang Enhancement***

Defendant contends that the trial court abused its discretion in denying his request to strike the 10-year punishment for the gang enhancement in case No. SS14185A (assault on a peace officer).  The Attorney General argues that no abuse of discretion has been shown.

A trial court has the discretion to strike a gang enhancement or to strike the additional punishment for the gang enhancement.  (§§ 1385, subd. (a), 186.22, subd. (g); *People v. Fuentes* (2016) 1 Cal.5th 218, 224, 231.)  In the trial court, defendant requested that the court strike the additional punishment for the gang enhancement under section 1385, subdivision (b)(1).  Section 1385, subdivision (b)(1) generally provides that a trial court may "strike the additional punishment" for an enhancement "in the furtherance of justice in compliance with subdivision (a)."[3]  Subdivision (a) of section 1385 in turn authorizes a court to dismiss an action "in furtherance of justice" pursuant to specified procedures.

" ' "[T]he language of [section 1385], 'in furtherance of justice,' requires consideration both of the constitutional rights of the defendant, and the interests of society represented by the People, in determining whether there should be a dismissal. [Citations.]" [Citations.]  At the very least, the reason for dismissal must be "that which would motivate a reasonable judge." [Citations.]' [Citations.]" (*People v. McGlothin*

---

[3]  Section 1385, subdivision (b)(1) generally authorizes a trial court to strike the additional punishment for an enhancement, while section 186.22, subdivision (g) specifically authorizes a trial court to strike the punishment for a gang enhancement. Section 186.22, subdivision (g) states:  "Notwithstanding any other law, the court may strike the additional punishment for the enhancements provided in this section or refuse to impose the minimum jail sentence for misdemeanors in an unusual case where the interests of justice would best be served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition."

(1998) 67 Cal.App.4th 468, 473, italics omitted.)  In determining whether to strike the additional punishment for an enhancement in furtherance of justice, a court is "guided . . . by the particulars of the [sentencing] scheme itself, informed as well by 'generally applicable sentencing principles relating to matters such as the defendant's background, character, and prospects,' including the factors found in California Rules of Court, rule 410 [now rule 4.410] et seq.  [Citation.]"  (*Id.* at p. 474; see *People v. Torres* (2008) 163 Cal.App.4th 1420, 1433, fn. 6 (*Torres*).)

A trial court's refusal to strike the additional punishment for an enhancement under section 1385 is reviewed for abuse of discretion.  (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1020 (*Lua*).)  A trial court abuses its discretion "when its determination is arbitrary or capricious or ' " 'exceeds the bounds of reason, all of the circumstances being considered.' " [Citations.]' [Citation.]"  (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121 (*Carbajal*).)  "For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]."  (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).)  "Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' [citation]."  (*Ibid.*; accord, *Lua*, *supra*, at p. 1020.)

In this case, we find no abuse of discretion in the trial court's refusal to strike the gang enhancement.  The court acknowledged that defendant had taken advantage of programs that were offered in prison and expressed "no doubt" that defendant was "a different person" than when he committed his crimes.  However, the court also referred to the "horrific nature of the crime here and the gang crimes that [defendant was] committing."  Regarding defendant's participation in the group assault on the sheriff's deputy, the court stated that the "whole assault was gang driven," a "shot-caller" gave

13

"the order . . . to attack, and fellow gang members did." The court ultimately concluded that the gang enhancement was "appropriate where this was solely a gang-driven offense." The "record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law." (*Carmony*, *supra*, 33 Cal.4th at p. 378; accord, *Lua*, *supra*, 10 Cal.App.5th at p. 1020.) Although defendant sought to establish to the trial court that he was a different person since the time of the offenses, defendant's assault on the deputy was committed solely on the order of another gang member and followed defendant's prior conviction for a gang-related killing. On this record, we cannot say the court's refusal to strike the gang enhancement for the assault on the deputy was "arbitrary or capricious or ' " 'exceed[ed] the bounds of reason, all of the circumstances being considered.' " [Citations.]' [Citation.]" (*Carbajal*, *supra*, 10 Cal.4th at p. 1121.)

Defendant contends that the trial court "failed to give proper weight" to the "evidence of his rehabilitation since he was first sentenced" and the fact that he "would still be sentenced to a term of imprisonment spanning decades if the court struck the punishment for the gang enhancement." The record reflects, however, that the trial court was well aware of both factors and considered the significance of both factors in exercising its discretion. Regarding defendant's rehabilitation efforts, the court expressly acknowledged that defendant "truly ha[d]" taken advantage of programs in prison and that the court "ha[d] no doubt [defendant was] a different person" now. The court indicated, however, that it had weighed those rehabilitation efforts with "the horrific" assault on the deputy and the prior gang killing and ultimately concluded that the "large number of years . . . is appropriate for [defendant's] sentence." In this regard, the court observed that the group assault by defendant and others on the sheriff's deputy was "solely a gang-driven offense" that occurred on the "order" of the "shot-caller." Defendant fails to cite any authority for the proposition that it was an abuse of discretion for the court to determine that the nature of his current offense and his prior criminal

14

gang history warranted imposition of the gang enhancement despite his rehabilitative efforts while in custody since the time the crimes were committed. (Cf. *Torres*, *supra*, 163 Cal.App.4th at pp. 1426, 1433 [finding that trial court stated sufficient reasons to strike gang allegations where the defendant was " 'youthful,' " had no prior record, and there was " 'no indication he was ever in any gang related activity prior to this instance' "].) To the contrary, on this record, the court was well within its discretion in determining that defendant fell within the particulars of the gang statute. (See *People v. Prunty* (2015) 62 Cal.4th 59, 74 [explaining that the Legislature "identified 'the organized nature of street gangs' as posing a unique threat to public safety" and that the "clear purpose of the [statute containing the gang enhancement] is to target these criminal groups"].) As "the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling . . . .' " (*Carmony*, *supra*, 33 Cal.4th at p. 378; accord, *Lua*, *supra*, 10 Cal.App.5th at p. 1020.)

### B. *Credit for Actual Time in Custody Through Resentencing*

Defendant contends that the trial court erred by failing to award an additional 1,092 days of credit for his actual time in custody following his sentencing on November 17, 2016, through his resentencing on November 14, 2019. The Attorney General concedes the issue. We find the Attorney General's concession appropriate.

The record reflects that on November 17, 2016, defendant was initially sentenced at a combined sentencing hearing for case No. SS141485A, involving the assault on the deputy, and case No. SS102792A, in which defendant had pleaded to two counts of voluntary manslaughter with a firearm enhancement and a gang enhancement. At the combined sentencing hearing, the trial court stated that the custody credits were "zero" in the case involving the assault on the deputy (case No. SS141485A) because defendant was "receiving credits on the other docket." In the voluntary manslaughter case (case

15

No. SS102792A), the court granted defendant 2,577 days of custody credits, consisting of 2,241 actual days and 336 days' conduct credit.

Following defendant's first appeal and this court's remand, a combined resentencing hearing was held on November 14, 2019. At the hearing, the trial court modified defendant's sentence for the two cases from 82 years to life to 77 years to life. The court did not grant any additional credit for actual custody time.

In *People v. Buckhalter* (2001) 26 Cal.4th 20 (*Buckhalter*), the California Supreme Court held that, "[w]hen, as here, an appellate remand results in modification of a felony sentence during the term of imprisonment, the trial court must calculate the *actual time* the defendant has already served and credit that time against the 'subsequent sentence.' (§ 2900.1.) On the other hand, a convicted felon once sentenced, committed, and delivered to prison is not restored to presentence status, for purposes of the sentence-credit statutes, by virtue of a limited appellate remand for correction of sentencing errors. Instead, he remains 'imprisoned' [citation] in the custody of the Director [of Corrections] 'until duly released according to law' [citation], even while temporarily confined away from prison to permit his appearance in the remand proceedings. Thus, he cannot earn good behavior credits under the formula specifically applicable to persons detained in a local facility, or under equivalent circumstances elsewhere, 'prior to the imposition of sentence' for a felony. (§ 4019, subds. (a)(4), (b), (c), (e), (f); . . .) Instead, any credits beyond *actual custody time* may be earned, if at all, only under the so-called worktime system separately applicable to convicted felons serving their sentences in prison. (§ 2930 et seq., . . .)" (*Id.* at p. 23.) "Accrual, forfeiture, and restoration of prison worktime credits are pursuant to procedures established and administered by the Director. [Citations.]" (*Id.* at p. 31.)

In this case, "the trial court, having modified defendant's sentence on remand, was obliged, in its new abstract of judgment, to credit him with all *actual* days he had spent in custody, whether in jail or prison, up to that time." (*Buckhalter*, *supra*, 26 Cal.4th at

16

p. 37.)  We will therefore order the judgment modified to include an additional 1,092 actual days of custody credit in case No. SS102792A (the voluntary manslaughter case) for defendant's time in custody following his sentencing at the original combined sentencing hearing on November 17, 2016, through the date of his resentencing on November 14, 2019, after appeal and remand.

Defendant also observes that the amended abstract of judgment filed on December 16, 2019, indicates in multiple places that defendant was sentenced on November 17, 2016, which was the date of the original combined sentencing hearing.  To avoid confusion regarding the calculation of custody credit, we will order the abstract of judgment corrected to indicate that defendant was sentenced on November 14, 2019, which was the date of his resentencing following appeal and remand.

### C.    *Abstract of Judgment*

Defendant contends that the abstract of judgment requires correction or clarification.  The Attorney General concedes the need for correction or clarification.  We find the concession appropriate.

First, the amended abstract of judgment for the indeterminate term (Judicial Council form CR-292), which was filed on December 16, 2019, indicates that in the case involving the assault on the deputy (case No. SS141485A), defendant was convicted in count 3 of a violation of section 245, subdivision (c), which the amended abstract describes as:  "Assault with deadly weapon other than a firearm."  We agree with the parties that this is not an accurate description of the crime.  We will order the abstract corrected to describe the crime as assault on a peace officer.

Second, the record reflects that when defendant was initially sentenced in 2016, the trial court filed two abstracts of judgment—one for the indeterminate term (Judicial Council form CR-292) and one for the determinate term (Judicial Council form CR-290).  Upon resentencing defendant in 2019, the trial court filed an amended abstract of judgment for only the indeterminate term (Judicial Council form CR-292).  That

17

amended abstract for the indeterminate term expressly refers to Judicial Council form CR-290, an abstract of judgment for a determinate term. We agree with the parties that amended abstracts for both the indeterminate and determinate terms should be filed to avoid the potential for confusion at the Department of Corrections and Rehabilitation, rather than relying on an amended abstract of judgment for an indeterminate term that appears to refer to an abstract of judgment for a determinate term filed years earlier.

Third, we agree with the parties that the amended abstracts of judgment should reflect the following: (1) in the caption of the abstracts of judgment, the box stating, "Amended Abstract," should be marked; and (2) on page 2, in the section regarding execution of sentencing, the box stating, "at resentencing per decision on appeal," should be marked.

## IV. DISPOSITION

The judgment is modified to reflect that in case No. SS102792A, defendant is entitled to 3,333 days of actual custody credit and 336 days of conduct credit, for a total of 3,669 days of credit as of the date of his resentencing on November 14, 2019. As so modified, the judgment in case Nos. SS141485A and SS102792A is affirmed.

The trial court is directed to prepare amended abstracts of judgment for the indeterminate and determinate terms (Judicial Council forms CR-292 and CR-290) encompassing case Nos. SS141485A and SS102792A. Both amended abstracts of judgment shall include the following:

(1)     the modification to the judgment regarding custody credits as set forth above;

(2)     in the caption, the box stating, "Amended Abstract," shall be marked;

(3)     in the caption ("DATE OF HEARING") and on page 2 in the section regarding credit for time served ("Date Sentence Pronounced"), the date shall be November 14, 2019; and

18

(4)     on page 2, in the section regarding execution of sentencing, the box stating, "at resentencing per decision on appeal," shall be marked.

In addition, the amended abstract of judgment for the indeterminate term shall reflect that defendant was convicted in case No. SS141485A, in count 3, of assault on a peace officer.

The trial court shall send a copy of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

DANNER, J.

*People v. Canchola*
**H047703**